## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

**April 02, 2025**

LAURA A. AUSTIN, CLERK
BY: **/s/ S. Wray**
DEPUTY CLERK

RILEY AMORE; and CAROLINE PARKER,

*individually and on behalf of all others similarly situated*,

      Plaintiffs,

v.

AMERICAN ASSOCIATION OF
VETERINARY CLINICIANS; SOLUTION
INNOVATIONS, INC.; VCA ANIMAL
HOSPITALS, INC.; BLUEPEARL
OPERATIONS, LLC; MEDVET
ASSOCIATES, LLC; RED BANK
VETERINARY HOSPITAL, P.C.;
UNIVERSITY OF PENNSYLVANIA
SCHOOL OF VETERINARY MEDICINE;
CUMMINGS SCHOOL OF VETERINARY
MEDICINE AT TUFTS UNIVERSITY;
PATHWAY VET ALLIANCE, LLC; THE
ANIMAL MEDICAL CENTER, INC.,

      Defendants.

CIVIL ACTION NO.  7:25CV00229

**COMPLAINT—CLASS ACTION**

(JURY TRIAL DEMANDED)

On behalf of themselves and all others similarly situated, Plaintiffs Riley Amore and Caroline Parker allege as follows based on personal knowledge as to themselves, the investigation of their counsel, and information and belief as to all other matters, and demand trial by jury.

## NATURE OF THE CASE

1.      This case is about upholding the rights of recent veterinary school graduates to obtain employment as veterinary interns and residents through a system of fair competition.

2.      Competition for labor is a foundational premise of the free market economy.  It allows working people to compare offers between prospective employers, negotiate improved terms of employment, and change jobs when better opportunities arise.

3.      It is also guaranteed by law.  Under the Sherman Act, employers must compete to attract employees.

4.      Agreements between employers not to compete for employees' labor are thus strictly prohibited.  This includes agreements: (1) not to hire one another's employees; (2) which fix, standardize, or suppress the compensation received by employees; (3) to allocate labor inputs; (4) to boycott certain potential employees; and (5) to exchange competitively sensitive information pertaining to the Relevant Markets (defined below).

5.      The Defendants in this case are a consortium of organizations that have illegally subverted the system of free competition in the U.S. labor market for veterinary interns and residents.  Instead of competing to hire veterinary interns and residents and allowing these individuals to negotiate better terms of employment and move between employers, Defendants have collectively designed and agreed to participate in a scheme that intentionally suppresses competition by forcing all such individuals to apply for employment through a system called the Veterinary Internship and Residency Matching Program (the "VIRMP").

6. The rules of VIRMP eliminate the prospective employees' ability to negotiate over the terms of employment they are offered, restricts them from moving between employers after they are hired, bars them from applying for veterinary internship and residency positions outside of the VIRMP, and provides the means for Defendants to police their co-conspirators compliance with these rules.

7. The VIRMP, in conjunction with the rules that govern it, is an anticompetitive agreement between virtually every employer of veterinary interns and residents in the United States, as well as the American Association of Veterinary Clinicians, and Solution Innovations, Inc.

8. The employers and institutions comprising and participating in the VIRMP further conspire to suppress, fix, stabilize, and standardize the compensation of veterinary interns and residents by exchanging competitively sensitive compensation information regarding residents' salaries and other employment benefits.

9. As a result of this anticompetitive conspiracy, veterinary interns and residents have suffered from artificially suppressed wages and employment benefits and been unable to improve their working conditions.

10. Plaintiffs bring this action, individually and on behalf of the proposed Class (defined below), to seek redress for the harm caused by Defendants' breach of the Sherman Act and to stop their illegal conspiracy.

## PARTIES

### I. Plaintiffs

11. Plaintiff Riley Amore is a natural person and a resident of Vinton, Virginia. Plaintiff Amore was employed as a veterinary intern by The Dallas Veterinary Surgical Center

from July 1, 2020, until July 6, 2021, during which they split their time between The Dallas Veterinary Surgical Center's Dallas and Plano locations. Plaintiff Amore obtained their veterinary intern position with Dallas Veterinary Surgical Center through the VIRMP. Plaintiff Amore's annual salary during their veterinary internship with Dallas Veterinary was $30,000, which was paid over the course of their employment.

12. Plaintiff Amore was additionally employed as a veterinary intern by Virginia-Maryland Regional College of Veterinary Medicine from July 15, 2021, to March 7, 2022. Plaintiff Amore obtained their veterinary intern position with the Virginia-Maryland Regional College of Veterinary Medicine through the VIRMP. Plaintiff Amore's annual salary during their veterinary internship with the Virginia-Maryland Regional College of Veterinary Medicine was $36,000, which was paid over the course of their employment. During their internship, Plaintiff Amore worked for Virginia-Maryland Regional College of Veterinary Medicine at its main campus in Blacksburg, Virginia and at a satellite campus operated by Virginia-Maryland Regional College of Veterinary Medicine in Roanoke, Virginia.

13. Plaintiff Caroline Parker is a natural person and a resident of Mason, Ohio. Ms. Parker was employed as a veterinary intern by Texas Equine Hospital, PC ("Texas Equine Hospital") from approximately July 2021 to July 2022. Ms. Parker obtained her veterinary intern position with Texas Equine Hospital through the VIRMP. Ms. Parker's annual salary during her veterinary internship with Texas Equine Hospital was approximately $50,000, which was paid over the course of her employment. Plaintiff Parker worked at Texas Equine Hospital's Bryan, Texas location.

## II.    Defendants

14.    Defendant American Association of Veterinary Clinicians ("AAVC") is an Illinois not-for-profit corporation.  Defendant AAVC maintains its principal office at 125 N. Main Street, Suite 500-403, Blacksburg, Virginia 24060.  Defendant AAVC is a membership organization with both individual veterinary clinician members and institutional members.[1]  Defendant AAVC has members in every state and the District of Columbia.  Defendant AAVC sponsors, administers, and operates the VIRMP, and is responsible for establishing the rules of the VIRMP and monitoring its implementation

15.    Defendant Solution Innovations, Inc. ("Solution Innovations") is a Virginia corporation.  Its principal office is located at 815 Surface View Cir., Blacksburg, VA 24060.  Defendant Solution Innovations assists in the administration of the VIRMP on behalf of Defendant AAVC and the co-conspiring employers of veterinary interns and residents.

16.    Defendant VCA Animal Hospitals, Inc. ("VCA") is a California corporation.  Its principal office is located at 12401 West Olympic Boulevard, Los Angeles, CA 90064.  VCA transacts business within this judicial district, including through the operation of an animal hospital located at 5146 Hildebrand Road, Roanoke, Virginia 24012.  Throughout the relevant time period, Defendant VCA participated in the VIRMP, entered into agreements to adhere to rules of the

---

[1] The following entities are institutional members of the AAVC: Angell Animal Medical Center; Auburn University; University of California, Davis; Colorado State University; Cornell University; University of Florida; University of Georgia; University of Illinois; Iowa State University; Kansas State University; Lincoln Memorial University; Midwestern University; Louisiana State University; Michigan State University; University of Minnesota; Mississippi State University; University of Missouri-Columbia; North Carolina State University; The Ohio State University; Oklahoma State University; Ontario Veterinary College (University of Guelph); Oregon State University; University of Pennsylvania; University of Prince Edward Island (Atlantic Veterinary College); Purdue University; University of Saskatchewan (Western College of Veterinary Medicine); University of Tennessee; Texas A&M University; Tufts University; Virginia-Maryland Regional College of Veterinary Medicine; Washington State University; University of Wisconsin-Madison.

VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

17.     Defendant BluePearl Operations, LLC d/b/a BluePearl Pet Hospital ("BluePearl") is a Florida limited liability company.  Its principal office is located at 2950 Busch Lake Boulevard, Tampa, Florida 33614.  Throughout the relevant time period, Defendant BluePearl has participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

18.     Defendant MedVet Associates, LLC ("MedVet") is an Ohio limited liability company.  Its principal office is located at 350 East Wilson Bridge Road, Worthington, Ohio 43085.  Throughout the relevant time period, Defendant MedVet participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

19.     Defendant Red Bank Veterinary Hospital, P.C. ("Red Bank") is a New Jersey professional corporation.  Its principal place of business is located at 197 Hance Ave, Tinton Falls, New Jersey 07724.  Throughout the relevant time period, Defendant Red Bank participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

20.     Defendant University of Pennsylvania School of Veterinary Medicine ("Penn Vet") is the veterinary college of the Trustees of the University of Pennsylvania.  Its principal office is located at 3800 Spruce Street, Philadelphia, Pennsylvania 19104.  Throughout the relevant time

period, Defendant Penn Vet participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

21.    Defendant Cummings School of Veterinary Medicine at Tufts University ("Tufts") is the veterinary college of the Trustees of Tufts College.  Its principal office is located at 200 Westboro Road, North Grafton, MA 01536.  Throughout the relevant time period, Defendant Tufts participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

22.    Defendant Pathway Vet Alliance, LLC d/b/a Thrive Pet Healthcare ("Thrive") is a Delaware limited liability company.  Its principal office is located at 800 West Cesar Chavez Street, Austin, Texas 78701.  Throughout the relevant time period, Defendant Thrive participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.

23.    Defendant The Animal Medical Center, Inc. d/b/a The Schwarzman Animal Medical Center of New York City ("Animal Medical Center") is a New York not-for-profit corporation.  Its principal office is 510 East 62nd Street, New York, New York 10065.  Throughout the relevant time period, Defendant Animal Medical Center participated in the VIRMP, entered into agreements to adhere to rules of the VIRMP, hired veterinary interns and residents through

the VIRMP, and entered into agreements to exchange competitively-sensitive veterinary intern and resident compensation information.[2]

24.    Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy, in particular by participating in the VIRMP to hire veterinary interns and residents.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

25.    Whenever, reference is made to any act of any corporation, property trust, LP, LLC, LLP, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

26.    Each of the Defendants named herein acted as the agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## JURISDICTION AND VENUE

27.    Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and recover damages, including treble damages, costs of suit, and  attorneys' fees, to redress the injuries sustained by the named Plaintiffs and the

---

[2] Defendant Animal Medical Center, together with Defendants Tufts, Penn Vet, Thrive, Red Bank, MedVet, BluePearl, and VCA are referred to throughout this Complaint as the "Employer Defendants."

members of the Class as a result of the Defendants' violations of Section 1 of the Sherman Act, 15

U.S.C. §1, as alleged in this Complaint.

28.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C

§1331 and 28 U.S.C. §1337.

29.     Personal jurisdiction exists over all Defendants pursuant to Section 12 of the

Clayton Act, 15 U.S.C. §22, and Virginia's long-arm statute, Va. Code Ann. §8.01-328.1.

30.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C.

§22, for each Defendant that maintains offices, has representatives, may be found, and/or transacts

business within this District within the meaning of Section 12 of the Clayton Act, including

Defendants AAVC, Solution Innovations, and VCA.

31.     Venue is also proper under 28 U.S.C. §§1391(b)(2), as a substantial portion of the

events giving rise to the claims brought herein occurred in this District. For example, from its

headquarters in Blacksburg, Virginia Defendant AAVC has designed and implemented the

VIRMP, including in every year throughout the time period applicable to this Complaint.  Many

of the overt acts in furtherance of the conspiracy committed by Defendant AAVC occurred in

Blacksburg, Virginia, including: adopting the rules and regulations governing the VIRMP;

recruiting new members into the conspiracy through solicitations to participate in the VIRMP;

renewing the participation of existing members in the VIRMP; accepting and processing

application materials from veterinarians wishing to obtain employment as veterinary interns or

residents through the VIRMP; accepting and processing materials from employers seeking to

employ veterinary interns and residents through the VIRMP; hosting the website www.virmp.org;

contracting with Defendant Solution Innovations; entering every other contract and agreement

described in this Complaint; and enforcing compliance with the rules governing the VIRMP.

32.     Personal jurisdiction and venue are also proper in this District because each Defendant illegally contracts, combines, and conspires with persons and entities that have committed, and continue to commit, overt acts within this District in furtherance of the illegal contract, combination, and conspiracy alleged in this Complaint.

## FACTUAL ALLEGATIONS

### I.     Veterinarians' Education and Employment

33.     Every year, thousands of people graduate from colleges of veterinary medicine across the United States.

34.     Upon graduation from a college of veterinary medicine, veterinary students earn a Doctor of Veterinary Medicine degree, which is often abbreviated as "DVM."

35.     Doctor of Veterinary Medicine graduates must pass the North American Veterinary Licensing Examination before they are permitted to practice in the United States.  State veterinary boards sometimes specify additional licensure requirements.

36.     In assessing their employment opportunities, soon-to-be veterinarians must decide whether to pursue a veterinary internship or residency.

37.     A veterinary internship is a one-year employment program offered to recently-graduated veterinarians.  Completing an internship is typically a pre-requisite to obtaining a residency position and becoming a board-certified specialist.

38.     A veterinary residency is an employment program offered to recent veterinary graduates, typically after they have completed an internship.  Veterinary residencies typically last two to three years.  An internship or residency is not required to practice as a veterinarian generally. However, residency experience is typically required to become a board-certified specialist, to practice as a specialist veterinarian, and, consequently, to obtain employment as a specialist.  Even

where residency experience is not a requirement to become a board-certified specialist, completing a residency accelerates a veterinarian's eligibility to take the board certification exams. Board certification is available in specialty fields like anesthesiology, dermatology, internal medicine, immunology, ophthalmology, radiology, and surgery, among others. Some board certifications also focus on the type of animal being treated, such as equine, avian, swine, or cattle.

39. Veterinary internships and residencies are therefore a necessary step for certain career pathways for licensed veterinarians. For other career pathways, they accelerate one's ability to begin practicing in a specialized field.

40. However, the market for employment of veterinary interns and residents is unlawfully restrained by the conspiracy described in this Complaint, which significantly depresses the wages and other employment benefits received by veterinary interns and residents.

## II.    Veterinary Internship & Residency Matching Program

41. Defendants and their co-conspirators' anticompetitive conspiracy is effected through the VIRMP.

42. Defendant AAVC sponsors and administers the VIRMP. Defendant AAVC additionally establishes the rules which govern the VIRMP, monitors and polices Defendants' and their co-conspirators' compliance with the rules, and generally coordinates the conspiracy known as the VIRMP.

43. Defendant AAVC designed, sponsors, operates, and administers the VIRMP from and within its headquarters located in Blacksburg, Virginia.

44. Veterinarians wishing to apply for employment through the VIRMP must rank the internship or residency programs where they wish to work in order from most desirable to least desirable. These rankings are referred to as a "Rank Order List."

45.    Veterinarians applying for positions through the VIRMP must also complete an Application Packet which contains their professional and educational credentials.  Both the Rank Order List and the Application Packet are submitted to Defendant AAVC through a portal on the website www.virmp.org.

46.    Employers seeking to employ veterinary interns and residents through the VIRMP must develop their own Rank Order Lists.  An employer's Rank Order List ranks the applicants the employer would like to employ in order of preference.  The employers likewise submit their Rank Order Lists to Defendant AAVC through a portal on the website www.virmp.org.

47.    After Defendant AAVC receives the Rank Order Lists from both the employers and the applicants, it uses a central computer facility (which, upon information and belief, is located within the Commonwealth of Virginia) to match the applicants with employers.

48.    Defendant AAVC contracts with Defendant Innovation Solutions to provide the computer program or algorithm which matches applicants to employers through the VIRMP.

49.    The results of the computer program or algorithm determine which applicants are matched to which employers.

50.    Those individuals applying for internships and residencies through VIRMP are contractually required accept employment at the program where they are matched by the VIRMP, and the employers to whom they are matched are likewise contractually required to offer those matched applicants employment.

51.    As Defendant AAVC explains in its publication "Basic Principles of the Selection Process," attached hereto as **Exhibit A**: "Applicants and institutions/private practices are fully committed to the results of the matching program when they sign the electronic agreement (Terms of Service) at the time an account is created.  Neither may negotiate inside or outside the matching

11

program until the match results have been announced.  Doing so is a violation of VIRMP rules and will result in a sanction."  Ex. A at 2-3.

52.    The algorithm used by Defendant AAVC to conduct the VIRMP is program-centric, meaning it favors the Rank Order Lists submitted by the employers.

53.    As Defendant AAVC explains in its publication "Basic Principles of the Selection Process," following the announcement of match results Defendant AAVC releases two lists to match participants.  First, it releases a list of all match applicants and the program to which they were matched.  Second, it releases a list of all unmatched applicants, including their addresses, telephone numbers and types of program to which they applied.  *Id*. at 2.

54.    Defendant AAVC imposes penalties on any participant (both programs and applicants) who breaks their agreement to accept the placements generated by the VIRMP or otherwise violates the rules governing the program.  Such penalties include being banned from re-applying for positions through the VIRMP and being banned from participating in the VIRMP as an employer.

55.    Defendant AAVC has banned applicants from participating in the VIRMP as a penalty for not accepting employment at the program to which they were assigned by the VIRMP.

56.    Defendant AAVC hosts the members of the conspiracy at annual meetings such as the Department Heads and Hospital Directors Meeting, as well as related working groups, committees, and subcommittees associated with each meeting.  The 2024 Department Heads and Hospital Directors Meeting was held in Atlanta, Georgia on March 21 and March 22, 2024.  Previous meeting of this group were held in Atlanta, Georgia in March 2023, March 2022, and March 2021.

57.     The rules governing the VIRMP are formalized in a series of agreements between Defendant AAVC, the Employer Defendants, and all other employers who participate in the VIRMP.

58.     Defendants use their dominant position in the Relevant Markets (defined below) to require veterinarians wishing to obtain employment as a veterinary intern or resident to enter into anticompetitive agreements as a condition of their participation in the VIRMP.

### A.     Institution Terms of Service

59.     All employers participating in the VIRMP must enter into the VIRMP's Institution Terms of Service.

60.     As stated in the AAVC publication "Programs—Getting Started," attached hereto as **Exhibit B**, "Participating institutions and private practices agree to the VIRMP Terms of Service at the time of registration." Ex. B at 1.

61.     Employers could begin to register for the 2025 VIRMP on September 2, 2024.  *Id.* at 3.  The month and approximate date of the program registration opening was substantially similar in each year applicable to this action.

62.     Employers participating in the 2025 VIRMP had to complete their registration by October 15, 2024.  *Id.* at 2.  The month and approximate date of the program registration deadline was substantially similar in each year applicable to this action.

63.     In each year applicable to this action, Employer Defendants and their co-conspirators registered for the VIRMP through the online portal accessible at www.virmp.org.

64.     Based upon the forgoing allegations, each Employer Defendant and every other program employing veterinary interns or residency through the VIRMP agreed to the VIRMP's

Institution Terms of Service between September and October in each year applicable to this action, and entered this agreement through the online portal accessible at www.virmp.org.

65.     For example, Virginia-Maryland Regional College of Veterinary Medicine joined and renewed its participation in the conspiracy each year from its main campus in Blacksburg, Virginia between September and October in each year applicable to this action through the online portal accessible at www.virmp.org.

66.     Each Employer Defendant and every other employer participating in the VIRMP has renewed its agreement with one another and with Defendant AAVC to be bound by the VIRMP's Institution Terms of Service in the same manner and at the same time each year as described above.

67.     The VIRMP's Terms of Service, including the Institution Terms of Service, are attached hereto as **Exhibit C**.

68.     The Institution Terms of Service provide that the Employer Defendants and their co-conspirators "agree that this institution or private practice will abide by the following Terms of Service effective immediately."  Ex. C, at 3.  The Institution Terms of Service also provide: "We understand that failure to do so will result in a ban from participation in the VIRMP for a period of at least 3 years." *Id.*

69.     By entering into and agreeing to be bound by the VIRMP's Institution Terms of Service, Employer Defendants commit to:

- "Offer appointments to all applicants matched with this institution or private practice by the VIRMP."  *Id.*

- "Make or require no commitments or contracts with applicants prior to the notification of the selections made through the VIRMP."  *Id.* at 4.

- "Abide by the official schedule, including ranking applicants and entering rankings through the VIRMP website no later than Wednesday, February 19, 2025."  *Id.*

- "Contact applicants matched to our institution or private practice on the day results are made available by the VIRMP." *Id.*

- "Not pursue or offer employment to an applicant who was matched elsewhere by the VIRMP unless that applicant has a written release from the institution or private practice to which they were matched." *Id.*

- "Not use the matching program to advertise for non-VIRMP programs/positions that are similar to programs/positions that we have placed in the VIRMP. By way of example, an institution or private practice may not place an internship program in the VIRMP and negotiate with VIRMP applicants prior to match day to fill additional positions in the same or similar program outside the VIRMP." *Id.*

70.    Employer Defendants enter into the Institution Terms of Service with Defendant AAVC, with one another and their co-conspirator employers.

71.    All Employer Defendants participating in the 2025 VIRMP were required to abide by the uniform application deadline of January 6, 2025.[3]  Ex. B, at 1.

## B.    Applicant Terms of Service

72.    All veterinarians seeking employment as an intern or a resident through the VIRMP are required to agree to the VIRMP's Applicant Terms of Service.  *See* Ex. C.

73.    As stated in the AAVC publication "Applicants—Getting Started," attached hereto as **Exhibit D**, "Applicants agree to the VIRMP Terms of Service at the time of registration."  Ex. D, at 1.  Those "Terms of Service require applicants who are matched to a program to show up for and start the program.  If an applicant does not start their matched program and is not released in writing by that program, the applicant may be subject to a sanction from participating in the VIRMP for a period of 3 years."  *Id.*

---

[3] The only exception to this rule, for laboratory animal residencies, constituted less than 5% of the total internship and residencies available through the VIRMP.

74.     By entering into and agreeing to be bound by the VIRMP's Applicant Terms of

Service, applicants commit to "abide by the results of the match effective immediately."  Ex. C, at

1.  They also agree:

- "To accept appointment to the institution with which I am matched, that institution being the highest one on my rank order list having a place available for me.  I understand that I cannot avoid accepting an internship or residency to which I have been matched without a written release from that institution.  Further, I understand that another institution that is participating in the VIRMP cannot accept me as an intern or resident unless I have this release.  In this paragraph, the term 'accept' means that I agree to be present for and begin the program to which I was matched by the VIRMP."  *Id.*

- "To abide by the official schedule, including ranking the programs for which I have applied and completing and finalizing my confidential ranking no later than Friday, February 14, 2025."  *Id.*

- "To pay the appropriate fee."  *Id.*

- "I shall not negotiate for nor accept a position prior to the release of the match results with a program listed in the VIRMP or a similar program at the same institution/private practice."  *Id.* at 2.

- "[M]y failure to abide by these Terms of Service will result in a ban from participation in the VIRMP for a period of at least 3 years."  *Id.* at 3.

75.     In each year applicable to this action, applicants participating in the VIRMP agreed

to the Applicant Terms of Service through the online portal accessible at www.virmp.org between

the months of November and January.

### III.    Exchange of Compensation Information

76.     Defendants further contract, combine, and conspire to exchange competitively

sensitive information regarding the salaries and employment benefits offered to veterinary interns

and residents ("Compensation Information") by each employer participating in the VIRMP.

77.    Defendants contract, combine, and conspire to exchange Compensation Information with the purpose and intent of depressing, standardizing, and stabilizing the salaries and other employment benefits received by veterinary interns and residents.

78.    The exchange of Compensation Information begins annually in September of each year when training program coordinators from each residency and internship employer participating in the VIRMP enter detailed information about the positions they are offering into the VIRMP online portal.  Among the information they enter is the annual salary for each position offered through the VIRMP.  Other information they enter includes any retirement benefits, the number of vacation days offered, and healthcare benefit information.

79.    This Compensation Information is then posted publicly on the VIRMP website.

80.    The VIRMP website lists every internship and residency position available through the VIRMP along with the corresponding Compensation Information, including salaries and fringe benefits.

81.    Defendant AAVC further provides the annual salary information entered into the VIRMP by the participating employers to the American Association of Veterinary Medical Colleges ("AAVMC") for analysis.

82.    AAVMC uses this information to publish an annual analysis of "Academic Internship Salaries Offered through the VIRMP" on behalf of Defendant AAVC.  This analysis is distributed to the AAVMC and AAVC's members.

83.    The "Academic Internship Salaries Offered through the VIRMP" publication describes the nationwide mean starting salary for veterinary internships offered in academic settings (e.g., positions offered in clinics run by colleges of veterinary medicine).  For the 2024-2025 program year, AAVMC stated that the mean starting salary for such positions was $37,513.

84.     AAVMC's annual analysis also provides the mean and median salaries offered by academic internship positions across four different regions of the United States.  For the 2024-2025 program year, AAVMC stated that the mean salaries by region were:

- $36,302 in the Midwest;

- $40,031 in the Northeast;

- $35,369 in the South; and

- $44,270 in the West.

85.     An excerpt from the most recent "Academic Internship Salaries Offered through the VIRMP" report published by the AAVMC showing these figures follows below:

| Table 1: | Average Salary Offered for Academic Internship Positions by Region | | | |
|---|---|---|---|---|
| Region | N of Positions Listed | Percentage of Positions Listed | Mean Salary | Median Salary |
| Midwest | 150 | 34.3% | $36,302 | $35,500 |
| Northeast | 64 | 14.6% | $40,031 | $38,000 |
| South | 167 | 38.2% | $35,369 | $35,000 |
| West | 56 | 12.8% | $44,270 | $50,000 |
| **Total** | **437** | **100.0%** | **$37,513** | **$37,500** |

86.     AAVMC's annual analysis also provides the mean and median salaries offered by academic residency positions on both a state-by-state and metropolitan-area basis.  An excerpt from the most recent "Academic Internship Salaries Offered through the VIRMP" report published by the AAVMC showing these figures follows below[4]:

---

[4] Only a partial excerpt is presented below.  The full "Academic Internship Salaries Offered through the VIRMP" report contains the same statistics for every state and at least one metropolitan area within each state every year.

| Table 2 | | | | |
|---|---|---|---|---|
| **Average Salary Offered for Academic Residency Positions by State** | | | | |
| **State/Metropolitan Area** | **Percentage of All Positions** | **N of All Positions** | **Mean** | **Median** |
| **Alabama** | **3.7%** | **16** | **$30,906** | **$30,750** |
| (Auburn-Opelika) | (3.0%) | (13) | ($30,885) | ($30,500) |
| (Montgomery) | (0.7%) | (3) | ($31,000) | ($31,000) |
| **Arizona** | **1.6%** | **7** | **$50,000** | **$50,000** |
| (Phoenix) | (1.6%) | (7) | ($50,000) | ($50,000) |
| **California** | **1.4%** | **6** | **$50,183** | **$50,183** |
| (Sacramento) | (1.4%) | (6) | ($50,183) | ($50,183) |
| **Colorado** | **3.9%** | **17** | **$50,706** | **$50,000** |
| (Denver) | (3.9%) | (17) | ($50,706) | ($50,000) |
| **Florida** | **5.0%** | **22** | **$44,000** | **$44,000** |
| (Gainesville) | (4.8%) | (21) | ($44,000) | ($44,000) |
| (Ocala) | (0.2%) | (1) | ($44,000) | ($44,000) |

87.    AAVMC's annual analysis also provides the mean and median salaries offered by internship programs broken down by practice area.  An excerpt from the most recent "Academic Internship Salaries Offered through the VIRMP" report published by the AAVMC showing these figures follows below:

Table 4:

**Average Salary Offered for Academic
Internship Positions by Practice Area**

| Practice Area | N of Positions Listed | Percentage of Positions Listed | Mean | Median |
|---|---|---|---|---|
| Ambulatory | 3 | 0.7% | $36,000 | $31,500 |
| Anesthesiology | 7 | 1.6% | $31,595 | $31,000 |
| Cardiology | 3 | 0.7% | $38,000 | $40,000 |
| Clinical Nutrition | 1 | 0.2% | $42,485 | $42,485 |
| Dermatology | 1 | 0.2% | $32,243 | $32,243 |
| Diagnostic Imaging and Radiology | 4 | 0.9% | $35,371 | $34,000 |
| Emergency Medicine/Critical Care | 18 | 4.1% | $38,736 | $36,000 |
| Equine | 2 | 0.5% | $41,122 | $41,122 |
| Exotic/Wildlife/Zoo | 20 | 4.6% | $40,834 | $40,000 |
| Farm Practice/Production Animal Medicine | 5 | 1.1% | $37,149 | $36,000 |
| Food Animal | 9 | 2.1% | $34,880 | $35,000 |
| Large Animal Surgery | 4 | 0.9% | $39,625 | $39,500 |
| Neurology | 8 | 1.8% | $35,267 | $35,588 |
| Oncology | 12 | 2.7% | $38,895 | $38,000 |
| Other | 9 | 2.1% | $36,273 | $38,500 |
| Rotating-Equine | 20 | 4.6% | $35,531 | $33,622 |
| Rotating-Large Animal | 23 | 5.3% | $37,625 | $37,500 |
| Rotating-Small Animal | 250 | 57.2% | $37,687 | $37,500 |
| Shelter Medicine | 9 | 2.1% | $39,135 | $36,800 |
| Small Animal Internal Medicine | 4 | 0.9% | $37,044 | $33,338 |
| Small Animal Surgery | 23 | 5.3% | $35,804 | $36,000 |
| Sports Medicine and Rehabilitation | 2 | 0.5% | $41,250 | $41,250 |
| **Total** | **437** | **100.0%** | **$37,513** | **$37,500** |

88.     By participating in the exchange of commercially sensitive information in accordance with the VIRMP rules, each Employer Defendant and every other employer participating in the VIRMP has agreed with one another and with Defendant AAVC to exchange Compensation Information.

89.     Each Employer Defendant and every other employer participating in the VIRMP has renewed its agreement with one another and with Defendant AAVC to exchange Compensation Information in the same manner and at the same time that the Employer Defendant agreed to participate in the VIRMP each year (as described above).

90.    Each Employer Defendant and every other employer participating in the VIRMP renews their agreement with one another and with Defendant AAVC to exchange Compensation Information with the knowledge and purpose that Defendant AAVC will publish the Compensation Information on the VIRMP website where it will be accessible to their competitors.

91.    Each Employer Defendant and every other employer participating in the VIRMP renews their agreement with one another and with Defendant AAVC to exchange Compensation Information with the knowledge, and purpose that Defendant AAVC will contract with AAVMC to produce, publish, and distribute to members of the conspiracy the "Academic Internship Salaries Offered through the VIRMP" report containing the detailed, granular analysis of Compensation Information described and excerpted above.

92.    The exchange of such compensation information is inconsistent with the joint guidance provided by the DOJ and the FTC. In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals."[5] That Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement. […] Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation.

> […]

> However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

> - a neutral third party manages the exchange,

---

[5] Available at https://www.justice.gov/atr/file/903511/dl.

- the exchange involves information that is relatively old,

- the information is aggregated to protect the identity of the underlying sources, and

- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

93.     The compensation information exchanges by Defendants do not comply with the criterial established by the DOJ and FTC. The exchanged compensation information was not "relatively old" or historical; rather, the information concerned *current* and *future* compensation. The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source."

94.     The federal government recently recommended that existing Antitrust Guidance concerning the exchange of wage information be strengthened. Specifically, in July 2021, President Biden issued an Executive Order that explicitly "[e]ncourage[d] the FTC and DOJ to strengthen antitrust guidance to prevent employers from collaborating to suppress wages or reduce benefits by sharing wage and benefit information with one another."[6] President Biden acknowledged that precisely the type of conduct Defendants engaged in here—exchanging wage data through third parties—is anticompetitive and harmful to workers when used "to collaborate to suppress wages and benefits."

95.     The agreement to exchange compensation information eliminated a major incentive for Employer Defendants and co-conspirators to increase compensation to veterinarian interns and residents working at their facilities in continental United States during the Class Period. The

---

[6] White House, *Fact Sheet: Executive Order on Promoting Competition in the American Economy* (July 9, 2021), https://www.presidency.ucsb.edu/documents/fact-sheet-executive-order-promoting-competition-the-american-economy; *see also* Exec. Order No. 14,036 at §5(f), 86 Fed. Reg. 36,987 (July 9, 2021), https://www.govinfo.gov/content/pkg/DCPD-202100578/pdf/DCPD-202100578.pdf.

advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing employers of interns and residents.

96.    The agreement to regularly exchange detailed and non-public information about current and prospective compensation to veterinarian interns and residents assured that the provision of superior compensation by any Employer Defendant would be timely and specifically known by its competitors. Such an agreement, therefore, eliminated the incentive of each Employer Defendant to compete with other employers of veterinarian interns and residents during the Class Period by offering better compensation.

97.    When employers that are competing for the same potential veterinarian interns and residents exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries, or benefits. That is, "when rivals exchange information about hiring and wages, they can monitor each other's practices and, as a result, avoid pressures to offer a competitive salary."[7]  Accordingly, each Employer Defendant used the compensation data obtained through the information exchanges to reduce the uncertainty that it should have faced from not knowing what their competitors were offering and providing in the labor market.

98.    The exchange of compensation information between Defendant Employers during the Class Period increased their relative bargaining power in setting wages, salaries, and benefits for veterinarian interns and residents.

99.    The exchange of Compensation Information allows and is specifically designed to facilitate each of the Employer Defendants' ability to fix, stabilize, standardize, and suppress the compensation received by veterinary interns and residents.

---

[7] Day, Gregory, "Anticompetitive Employment," *American Business Law Journal*, Vol. 57, Issue 3, 487-535 (Fall 2020), at p. 500.

100.    Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely, and detailed compensation data was not reasonably necessary to further any procompetitive purpose.

## IV.    Anticompetitive Effects

101.    The restraints on trade embodied in the contracts, combination, and conspiracy described above have anticompetitive effects on the markets for the hiring, employment, and compensation of veterinary interns and residents.

102.    The agreements comprising the VIRMP restrain trade in the market for the employment of veterinary interns and residents in the following ways, among others:

- Requiring applicants to accept employment with the program to whom they are matched by the VIRMP.

- Prohibiting applicants from negotiating or accepting a position prior to the release of the match results with a program participating in the VIRMP or a similar program at the same institution/private practice.

- Prohibiting employers from making commitments or contracts with applicants prior to the notification of the selections made through the VIRMP.

- Prohibiting employers from pursuing or offering employment to an applicant who was matched elsewhere by the VIRMP unless that applicant has a written release from the institution or private practice to which they were matched.

- Requiring participating employers to offer all veterinary and residency positions available through the VIRMP.

- Requiring employers and applicants to adhere to a standardized and uniform application and hiring schedule.

- Prohibiting veterinary interns and residents from transferring between programs participating in the VIRMP.

- Imposing penalties on applicants and employers who breach the terms of their agreement outlined in the VIRMP Terms of Service.

103.    Defendants further restrain trade in the market for the hiring, employment, and compensation of veterinary interns and residents by contracting, combining, and conspiring to exchange Compensation Information.

104.    Each of these agreements in restraint of trade has anticompetitive effects on the market for the employment of veterinary interns and residents.

105.    The anticompetitive effects of these restraints are demonstrated by the difference in salaries and benefits received by veterinary interns and residents and first-year veterinarians who do not pursue a residency.

106.    Each year, the American Veterinary Medical Association ("AMVA") publishes a "Report on the Economic State of the Veterinary Profession."

107.    The 2025 AMVA Report on the Economic State of the Veterinary Profession (the "2025 AMVA Report") includes the following table of average salaries for first-year veterinarians by employment category:

**AVERAGE COMPENSATION**

| Position type | Average compensation | Number of respondents |
|---|---|---|
| Private practice (full-time only) | $131,210 | 1,822 |
| Public practice (full-time only) | $105,829 | 71 |
| Internships | $56,705 | 774 |
| Residencies | $54,847 | 69 |
| All graduates who accepted an offer | $106,963 | 2,794 |

*New graduates were asked to provide either their starting salary for the first year (if compensated with a guaranteed salary only) or, if compensated through a base salary plus a production bonus, their base salary for the first year, along with their best estimate of the anticipated production bonus for that year. These values were then used in calculations of average annual compensation for those entering full-time employment.*

108.    As shown in the table above, the average compensation for first-year veterinarians entering private practice was $131,210 (as reported by 1,822 respondents) and for those entering

public practice was $105,829 (as reported by 71 respondents) according to the 2025 AVMA Report.

109.    As shown in the table above, the average compensation for veterinary interns was $56,705 (as reported by 774 respondents) and for veterinary residents was $54,847 (as reported by 69 respondents) according to the 2025 AVMA Report.

110.    The 2025 AMVA Report further states that "Internship stipends in 2024 averaged approximately $57K—well below average starting salaries for full-time employment."

111.    Non-intern and non-resident veterinarians in their first year of employment are often additionally able to negotiate sign-on bonuses in the tens of thousands of dollars.

112.    Veterinary interns and residents are paid about half of what their non-resident colleagues earn on average, despite having the same qualifications and experience.

113.    Veterinary interns and residents who obtained employment through the VIRMP are further not able to negotiate sign-on bonuses.

114.    This significant differentiation in compensation between veterinarians with the exact same level of experience and training is caused by the anticompetitive restraints imposed by the contracts, combinations and conspiracies entered into by Defendants, and this differentiation supports the fact that the markets for the employment of veterinary interns and residents is a separate labor market than market for the employment of non-resident and non-intern veterinarians.

115.    Plaintiffs and each member of the Class have been directly and proximately harmed by suffering suppressed compensation for their employment as a veterinary intern or resident as a result of the anticompetitive restraints imposed by Defendants.

116.    In a market free of the anticompetitive restraints described herein, each employer of veterinary interns or residents would have a unilateral self-interest to compete against other employers to recruit, hire, and employ the most qualified applicants for each position.[8]  However, "[e]mployers may refuse to compete in order to manipulate the market away from its competitive point."[9]  For instance, employers can "suppress wages by limiting employee mobility [and] [t]o limit employee mobility, employers may forego hiring each other's workers."[10]  Indeed,  the effect of the conspiracy on wages and other employment benefits is so significant as to displace this unilateral self-interest because the employers realize enormous savings on the wages and benefits paid to veterinary interns and residents as a result of the conspiracy.[11]

117.    Defendants intentionally entered into the contracts, combinations, and conspiracies described above with the design and purpose of suppressing the compensation received by veterinary interns and residents in the Relevant Markets.

## VI.    Market Definition

118.    There are distinct relevant markets for the employment of veterinary interns and residents in the United States.

---

[8]  Eric A. Posner, "Matching Markets and Labor Monopsony: A Comment on the Priest/Roth Debate," Coase-Sandor Institute for Law and Economics Research Paper No.1015, 3 (2024) (discussing how prior to the implementation of the medical resident matching process, hospitals competed for the best applicants by making offers earlier and earlier).

[9]  Day, Gregory, "Anticompetitive Employment," *American Business Law Journal*, Vol. 57, Issue 3, 487-535 (Fall 2020), at p. 504.

[10] *Id.*, at p. 501.

[11] Melissa Mayeux, "A Match Made in Antitrust Heaven? A Liberalistic Exploration of the Medical Match's Antitrust Exemption," 13 Wash. U. Jur. Rev. 121 (2020) ("In an academic hospital, patients receive the majority of their care from medical residents. This labor is valued at approximately $1.6 billion dollars annually, yet hospitals get it for far less.").

### A.    Relevant Labor Markets

119.    The product markets (or in this case, the labor markets) are the markets for the employment of veterinary interns (the "Relevant Labor Market for Veterinary Interns") and residents (the "Relevant Labor Market for Veterinary Residents") (together, the "Relevant Labor Markets").

120.    The internship and residency programs, including those offered by each Employer Defendant, are the buyers in the Relevant Labor Markets.

121.    The veterinary interns and residents, including Plaintiffs and each member of the Class, are the sellers in the Relevant Labor Markets.

122.    The Relevant Labor Markets are distinct, stable, and insulated from price fluctuations in potential substitute markets, including the general market for veterinarians.

123.    There are no viable economic substitutes for veterinary internships and residencies, respectively.  Veterinarians are not medical doctors and therefore cannot treat human beings. Individuals seeking to become veterinarians attend colleges of veterinary medicine rather than medical schools.  Colleges of veterinary medicine do not train physicians, and their graduates receive Doctor of Veterinary Medicine degrees rather than the Doctor of Medicine or Doctor of Osteopathic Medicine degrees conferred by medical schools.  At each university in the country that operates both a college of veterinary medicine and medical school, the admission process, administration, curriculum, instructors, student body, and clinical programs of the college of veterinary medicine are separate and distinct from those of the medical school.  Colleges of veterinary medicine are accredited solely by the American Veterinary Medical Association—and the Liaison Committee on Medical Education, which accredits medical schools, does not accredit colleges of veterinary medicine.

124.    Furthermore, becoming a board-certified specialist as a veterinarian typically requires residency experience.  In the minority of cases where a residency is not required to become a board-certified specialist, residency experience accelerates one's eligibility to take board certification exams (e.g., a veterinarian may become eligible to take board certification exams after four years of general practice, or just one year of residency).

125.    In order to obtain a residency, veterinarians typically need internship experience. In the minority of cases where internship experience is not required for a residency, internship experience accelerates a veterinarian's eligibility for a residency (e.g., a residency position may require one year of internship experience or three years of general practice experience).

126.    Some veterinarians undertake consecutive internships while they continue to seek employment as a veterinary resident in order to become eligible for certification as a specialist.

127.    The American Medical Veterinary Association ("AMVA") maintains an approved list of Recognized Veterinary Specialty Organizations ("RVSO").  Each RVSO certifies veterinary specialists in either a substantive area of animal medicine (e.g., internal medicine, dermatology, toxicology, etc.) or a specific type of animal (e.g., equine, poultry, exotic).  There are currently 22 RVSOs recognized by the AMVA.

128.    RVSOs establish the eligibility requirements (including training, education, and examination requirements) for board certification in their designated specialty area(s).

129.    Most specialty board certifications require residency experience.  The RVSOs approve (or accredit) the residency programs which make veterinarians eligible for board certification in their designated specialty area(s).

130.    For example, the American College of Veterinary Internal Medicine ("ACVIM") is the RVSO which governs internal medicine board certifications.  ACVIM is by far the largest

RVSO by number of certified specialists.  The certifications offered by the ACVIM include cardiology, small animal internal medicine, large animal internal medicine, neurology, oncology, nutrition, and others.

131.    The ACVIM maintains a list of "Approved Residency Training Programs" for each of these specialties.  Employment with an Approved Residency Training Program is required to obtain board certification in a specialty field from the ACVIM.  To obtain employment with any ACVIM-Approved Residency Training Program, applicants must apply through the VIRMP.

132.    In the minority of cases where residency experience is not required to become board-certified, the RVSOs confer accelerated eligibility for board certification exams on veterinarians who have residency experience.   For example, the American College of Theriogenologists requires two years of residency experience or six years of post-DVM experience to become eligible to sit for its board certification exam.

133.    Thus, veterinary internships and residents open considerable new career pathways for veterinarians, and are either required or significantly accelerate a veterinarian's ability to become board certified in a specialty area, practice as a specialist, and obtain employment as a specialist.

134.    Veterinarians continue to apply for internship and residency positions in the Relevant Labor Markets despite the dramatically lower salaries and benefits offered in the Relevant Labor Markets compared to those offered in other potential employment markets for veterinarians because there are distinct qualities associated with the Relevant Labor Market.

135.    The distinct qualities of the Relevant Labor Markets include: (1) additional clinical training; (2) the ability to obtain later employment which requires participation in the Relevant

Labor Markets; (3) the ability to become board certified in a specialty area after participating in the Relevant Labor Markets; and (4) substantially lower compensation.

136.    The Relevant Labor Markets are stable.  From 2021 to 2024, the number of positions available in the Relevant Labor Market for Veterinary Interns ranged between from about 1,550 to about 1,780.  From 2021 to 2024, the number of positions available in the Relevant Labor Market for Veterinary Residents ranged from about 420 to about 500.

137.    The Relevant Labor Markets are insulated from price fluctuations in potential substitute markets.  A small but significant non-transitory decrease (e.g., 5% over a period of one year) in the salaries of intern and resident veterinarians would not cause a decline in the number of applicants seeking employment in the Relevant Labor Markets, as evidenced by the significant wage gap between intern and resident veterinarians and veterinarians working outside of the Relevant Labor Market.

### B.    Relevant Geographic Market

138.    The geographic market for the employment of veterinary interns and residents is the United States (the "Relevant Geographic Market") (together with the Relevant Labor Markets, the "Relevant Market").

139.    Veterinarians seeking employment as interns and residents regularly move across the country and between states and geographic regions to obtain that employment.

140.    State veterinary regulatory boards license veterinarians and maintain reciprocity agreements with the boards of other states which facilitate the mobility of veterinarians across the United States.

141.    The approval or accreditation standards for veterinary residency program leading to board certification in specialty areas are standardized throughout the United States by the RVSOs.

142.    Veterinarians seeking employment as interns and residents outside the United States would face barriers including visa and work permitting issues, as well as licensing and board certification transferability hurdles.

## V.    Market Power

143.    Defendants, by and through the contracts, combinations, and conspiracies described in this Complaint, have market power in the Relevant Markets.  As they are purchasers in the relevant market, this is monopsony market power.

144.    In 2024, 2,042 internship and residency positions were offered exclusively through the VIRMP.  That number decreased slightly from the 2,061 positions offered through the VIRMP in 2021.

145.    In each year applicable to this action, fewer than 600 veterinary internship and residency positions were available to applicants outside of the VIRMP.

146.    Based on the foregoing allegations, at least 70% of internship and residency positions in the Relevant Markets were offered exclusively through the VIRMP in each year applicable to this action.

147.    Defendants, by and through the contracts, combinations, and conspiracies described in this Complaint, have market power in the Relevant Labor Market for Veterinary Interns.

148.    The following table shows the number of veterinary internship positions offered exclusively through the VIRMP from 2021 to 2024:

| Year | Internship Positions in the VIRMP |
|------|-----------------------------------|
| 2021 | 1,639 |
| 2022 | 1,788 |
| 2023 | 1,726 |
| 2024 | 1,558 |

149.    Fewer than 350 veterinary internship positions were available outside the VIRMP during each year applicable to this action.

150.    Based on the forgoing allegations, at least 75% of veterinary internship positions in the Relevant Labor Market for Veterinary Interns were offered exclusively through the VIRMP in each year applicable to this action.

151.    Defendants, by and through the contracts, combinations, and conspiracies described in this Complaint, have market power in the Relevant Labor Market for Veterinary Residents.

152.    The following table shows the number of veterinary residency positions offered exclusively through the VIRMP from 2021 to 2024:

| Year | Residency Positions in the VIRMP |
|------|----------------------------------|
| 2021 | 422 |
| 2022 | 503 |
| 2023 | 494 |
| 2024 | 484 |

153.    Fewer than 125 veterinary residency positions were available outside the VIRMP during each of the years applicable to this action.

154.    Based on the forgoing allegations, at least 70% of veterinary residency positions in the Relevant Labor Market for Veterinary Interns were offered exclusively through the VIRMP in each year applicable to this action.

## VI.    Antitrust Injury

155.    As a direct and proximate result of the actions and omission of the Defendants as described in this Complaint (including the operation of the VIRMP, the corresponding agreements, and the exchange of Compensation Information), Plaintiffs and all members of the Class suffered substantial losses to their business or property in that their compensation and other benefits associated with working as a veterinary intern or resident was artificially suppressed during the relevant time period.

## VIII.    Continuing Violation

156.    The violations of the Sherman Act by Defendants are ongoing and continuous as Defendants continue to participate in the VIRMP and adhere to the rules governing their collective participation in the same.

157.    Veterinary interns and residents currently employed by members of the conspiracy, including the Employer Defendants, are being harmed on a repeated and ongoing basis as result their employment compensation and associated benefits having been artificially suppressed through Defendants' anticompetitive conduct.

## IX.     Interstate Commerce

158.    Each of the Defendants is engaged in interstate commerce.

159.    Defendant AAVC organizes events and conferences in several states and invites individuals from across state lines to attend those events and conferences.  Defendant AAVC has members in all fifty states.  Defendant AAVC accepts and sends payments via interstate wires, distributes published materials in hard copy and over the internet in every state, and employs individuals in multiple states.

160.    Defendant Solution Innovations transacts business in the United States, including across state lines.  Defendant Solution Innovations receives and processes information from VIRMP applicants and programs located in every state.  Defendant Solution Innovations sends personnel across state lines to transact business with its clients.  Defendant Solution Innovations accepts and sends payments and via interstate wires and distributes published materials over the internet in every state.

161.    Each Employer Defendant transacts business across state lines, including through the purchase, sale, and delivery of goods and services across state lines; procuring and receiving employment applications through VIRMP from potential employees located in different states; employment of individuals residing in different states; and contracting with businesses located in different states.

## CLASS ACTION ALLEGATIONS

162.    Pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), Plaintiffs bring this action on behalf of themselves and members of the "Class" defined as follows:

> All natural persons in the United States employed as a veterinary
> intern or resident at any time between April 2, 2021, and the date of
> class certification and who obtained that employment through the
> Veterinary Internship and Residency Matching Program.

163.    Excluded from the Class are Defendants' officers, and directors; any entity in which

any Defendant has a controlling interest; and the affiliates, legal representatives, attorneys,

successors, heirs, and assigns of Defendants.  Also excluded from the Class are members of the

judiciary to whom this case is assigned, their families, and members of their staff.

164.    Plaintiffs reserve the right to modify the class definition, including based on

discovery and further investigation.

165.    The members of the Class are so numerous that their individual joinder is

impracticable.  Plaintiffs are informed and believe, and thereupon allege, that the members of the

Class number above 5,000.  The precise number of members of the Class and their identities are

unknown to Plaintiffs at this time but will be readily determined in discovery, including by

reference to Defendants' records.  Members of the Class may be notified of the pendency of this

action by email, mail and/or publication through the records of Defendants.

166.    Plaintiffs' claims are typical of the claims of the members of the Class they seek to

represent in that Plaintiffs and all members of the Class were injured and sustained damages by

Defendants' uniform wrongful conduct—namely, Defendants' entry into agreements in restraint

of trade in the Relevant Market which have suppressed the compensation received by members of

the Class for their labor as veterinary interns and residents.

167.    Common questions of law and fact exist as to all members of the Class and

predominate over questions affecting only individual members.  Legal and factual questions

common to the Class include, but are not limited to:

a.    Whether Defendants engaged in the alleged conduct;

b.  Whether the Relevant Market is properly defined;

c.  Whether the Defendants, by and through the conspiracy, contracts, and combinations described herein have market power in the Relevant Markets;

d.  Whether the restraints on trade described herein have anticompetitive effects;

e.  Whether compensation for veterinary interns and residents and other terms of employment have been fixed, depressed, standardized and/or stabilized at levels below those which would prevail in a competitive market;

f.  The amount of damages suffered by members of the Class as a result of the Defendants' illegal restraints;

g.  Whether members of the Class are entitled to equitable relief, including injunctive relief;

h.  Whether Defendants are jointly and severally liable for the damages sustained by Plaintiffs and the Class;

i.  Whether Plaintiffs' and the Class's damages should be trebled under the Sherman Act.

168.    Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other members of the Class they seek to represent, they have retained competent counsel experienced in antitrust matters and prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

169.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of such issues.

<u>**COUNT I**</u>
**Agreements in Restraint of Trade**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. §1**
**(By All Plaintiffs, Individually and on Behalf of Members of the Class,**
**Against All Defendants)**

170.    Plaintiffs, individually and on behalf of the Class, incorporate and repeat the allegations contained in the foregoing paragraphs.

171.    Defendants have contracted, combined, and conspired to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

172.    The contract, combination, and conspiracy alleged in this Complaint consists of a continuing agreement, understanding, and concert of action among Defendants to restrain competition in the recruitment, hiring, employment, and compensation of veterinary interns and residents.

173.    Defendants have agreed between and amongst themselves to restrain the aforesaid competition by entering into agreements, both express and implicit, designed to accomplish those ends, including but not limited to the agreements to participate in the VIRMP, adhere to the VIRMP's Institution Terms of Service, as well as to impose the VIRMP's Applicant Terms of Service upon all individuals seeking employment as veterinary interns or residents through the VIRMP, as well as to exchange Compensation Information.

174.    Defendants illegally restrain competition in a number of related ways, including but not limited to by:

    a.    Requiring applicants to accept employment with the program where they are matched by the VIRMP.

    b.    Prohibiting applicants from negotiating or accepting a position prior to the release of the match results with a program participating in the VIRMP or a similar program at the same institution/private practice.

    c.    Prohibiting employers from making commitments or contracts with applicants prior to the notification of the selections made through the VIRMP.

    d.    Prohibiting employers from pursuing or offering employment to an applicant who was matched elsewhere by the VIRMP unless that applicant has a written release from the institution or private practice to which they were matched.

    e.    Requiring participating employers to offer all veterinary and residency positions available through the VIRMP.

    f.    Requiring employers and applicants to adhere to a standardized and uniform application and hiring schedule.

    g.    Prohibiting veterinary interns and residents from transferring between programs participating in the VIRMP.

    h.    Imposing penalties on applicants and employers who breach the terms of their agreement outlined in the VIRMP Terms of Service.

175.    The illegal restraints alleged in this Complaint have the purpose and effect artificially fixing, depressing, standardizing, and stabilizing veterinary intern and resident compensation and other terms of employment.

176.    The restraints on competition alleged in this Complaint are per se illegal under the Sherman Act.

177.    The Employer Defendants are horizontal competitors in the Relevant Markets for the hiring, employment, and compensation of veterinary interns and residents in the U.S.

178.    The Employer Defendants have agreed with one another to restrain competition for the hiring, employment, and compensation of veterinary interns and residents in the manners described in this Complaint.

179.    Alternatively, the restraints on competition alleged in this Complaint are illegal under either a "quick look" or rule of reason analysis because they are facially anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

180.    Each Defendant has participated in one or more overt acts in furtherance of the alleged contract, combination and conspiracy and has participated in the conspiratorial activities described in this Complaint.

181.    Plaintiffs and each member of the Class were injured by the illegal restraints alleged in this Complaint.  Among other injuries, Plaintiffs and the members of the Class were compensated substantially less than they would have been in the absence of the illegal restraints. Plaintiffs and each member of the Class have sustained substantial losses and damages to their business and property due to the illegal restraints.

## COUNT II
### Exchange of Competitively-Sensitive Information
### Violation of Section 1 of the Sherman Act, 15 U.S.C. §1
### (By All Plaintiffs, Individually and on Behalf of Members of the Class,
### Against All Defendants)

182.    Plaintiffs, individually and on behalf of the Class, incorporate and repeat the allegations contained in the foregoing paragraphs.

183.    Defendants have contracted, combined, and conspired to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

184.    The contract, combination, and conspiracy alleged in this Complaint consists of a continuing agreement, understanding, and concert of action among Defendants to restrain competition in the recruitment, hiring, employment, and compensation of veterinary interns and residents.

185.    Defendants have agreed between and amongst themselves to restrain the aforesaid competition by entering into agreements, both express and implicit, designed to accomplish those ends, including but not limited to agreements to regularly exchange commercially sensitive Compensation Information.

186.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful per se.

187.    Defendants' information exchange is also unlawful under either a "quick look" or rule of reason analysis because the exchange is facially anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

188.    Each Defendant has participated in one or more overt acts in furtherance of the information exchange.

189.    Plaintiffs and each member of the Class were injured by the information exchange alleged in this Complaint.  Among other things, Plaintiffs and the members of the Class were compensated substantially less than they would have been in the absence of the information exchange.  Plaintiffs and each member of the Class have sustained substantial losses and damages to their business and property due to the illegal information exchange.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment against Defendants, for themselves and on behalf of the members of the Class, as follows:

A.    For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23 and naming Plaintiffs as representatives of the Class and Plaintiffs' undersigned attorneys as counsel to represent the Class;

B.    For an order enjoining all aspects of Defendants' continuing violation of Section 1 of the Sherman Act pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26;

C.    Judgment in favor of Plaintiffs and the members of the Class against Defendants on the claim for relief stated in this Complaint;

D.    Awarding to Plaintiffs and the Class three times their actual damages against Defendants, jointly and severally, for their violation of Section 1 of the Sherman Act set forth in this Complaint;

E.    Pre- and post-judgment interest;

F.    Attorneys' fees, costs and expenses to Plaintiffs' counsel pursuant to 15 U.S. Code §15; and

G.    For any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and members of the Class, hereby demand a trial by jury

pursuant to Federal Rule of Civil Procedure 38(b) on all claims and issues so triable.

Dated: April 2, 2025                    Respectfully submitted,

                                        /s/ *Roman Lifson*
                                        Roman Lifson (VSB #43714)
                                        David B. Lacy (VSB #71177)
                                        CHRISTIAN & BARTON, LLP
                                        901 E. Cary Street, Suite 1800
                                        Richmond, VA  23219
                                        Tel: (804) 697-4100
                                        Fax: (804) 697-6112
                                        rlifson@cblaw.com
                                        dlacy@cblaw.com

                                        Frank S. Hedin*
                                        Florida Bar No. 109698
                                        Julie Holt*
                                        Florida Bar No. 95997
                                        HEDIN LLP
                                        1395 Brickell Avenue, Suite 610
                                        Miami, Florida 33131
                                        Telephone: (305) 357-2107
                                        fhedin@hedinllp.com
                                        jholt@hedinllp.com

                                        Tyler K. Somes*
                                        Washington DC Bar No. 90013925
                                        HEDIN LLP
                                        1100 15th Street NW, Ste 04-108
                                        Washington, D.C. 20005
                                        Telephone: (202) 900-3331
                                        tsomes@hedinllp.com

Matthew J. Perez*
New York Bar. No. 4937728
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 24th Floor
Telephone: (212) 233-6444
Facsimile: (212) 223-6334
matt.perez@scott-scott.com

Patrick McGahan*
New York Bar. No.  5770276
SCOTT+SCOTT ATTORNEYS AT LAW LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06145
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
pmcgahan@scott-scott.com

* Pro Hac Vice Application Forthcoming

*Counsel for Plaintiffs and the Proposed Class*