**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

| | |
|---|---|
| METE ENDER TUNCAY, DVM, SONYA SHAW, DVM, SARAH JONES, DVM, and ALLISON COX, DVM<br><br>*Individually and on behalf of all other similarly situated,*<br><br>Plaintiffs,<br>v.<br><br>AMERICAN ASSOCIATION OF VETERINARY CLINICIANS, et al.,<br><br>Defendants. | Civil Action No. 7:25-cv-00229<br><br>The Honorable Elizabeth K. Dillon |

**DEFENDANTS AMERICAN ASSOCIATION OF VETERINARY CLINICIANS' AND SOLUTION INNOVATIONS, INC.'S MEMORANDUM IN SUPPORT OF THEIR JOINT MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT**

## I. INTRODUCTION

Defendant American Association of Veterinary Clinicians ("AAVC") administers the rank-order residency matching program at issue in this dispute, the Veterinary Internship and Residency Matching Program ("VIRMP"). Defendant Solution Innovations, Inc. ("Solution Innovations") provides the software utilized for the VIRMP. They jointly submit this Memorandum in Support of their Motion to Dismiss the First Amended Consolidated Complaint because Section 37b of Title 15 of the United States Code immunizes rank-order matching programs like the VIRMP from antitrust liability and because Plaintiffs have not otherwise plausibly alleged that AAVC and Solution Innovations conspired to depress wages or unlawfully restrain trade. 15 U.S.C. § 37b ("Antitrust lawsuits challenging the matching process, regardless of their merit or lack thereof,

have the potential to undermine this highly efficient, pro-competitive, and long-standing process.").[1]

Residency matching programs are statutorily exempt from antitrust liability and are an integral part of the medical education system. 15 U.S.C. § 37b. Addressing this issue within the context of medical training, Congress has recognized that residency matching programs like the VIRMP are not only pro-competitive but vital in reducing the pressures placed on graduate students to select a specialty too early in their medical education. *See* 15 U.S.C. § 37b(a)(1). For over fifty years, the VIRMP has ensured that fourth-year students in Doctor of Veterinary Medicine (DVM) programs and former graduate interns are presented with the opportunity to obtain positions with internship and residency programs free from the pressure to accept job offers under oppressive time constraints. Recognizing their inherent, pro-competitive nature, Congress has expressly legislated that residency matching programs are categorically exempt from antitrust scrutiny and that plaintiffs are barred from relying on these match programs as an alleged centerpiece of broader conspiracy claims. *See* 15 U.S.C. § 37b. First, the best reading of Section 37b indicates that the VIRMP is a graduate medical education residency matching program that falls under these statutory protections. Second, Plaintiffs still fail, even after another amendment, to plausibly allege that AAVC and Solution Innovations entered any conspiracy to restrain trade or artificially fix wages. For these reasons and as set out further below, the Court should dismiss the Plaintiffs' Amended Complaint with prejudice.

## II. SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS

AAVC sponsors the VIRMP, a program that matches recent or upcoming veterinary school graduates with internships and residencies at veterinary clinics and hospitals.

[1] AAVC and Solution Innovations also join in the omnibus motion to dismiss filed by all defendants.

(E.C.F. No. 232 ¶ 19.) Solution Innovations provides web development and database design for the VIRMP under contract with AAVC. (E.C.F. No. 232 ¶¶ 20, 67.) Each fall, employer programs participating in the VIRMP enter their internship and salary information into the VIRMP database, and AAVC and Solution Innovations then publicly publish a list of all positions available through the VIRMP for that match cycle. (E.C.F. No. 232 ¶ 65.) From November to February, applicants enter a rank-order list of their desired internship and residency programs into the VIRMP database, along with other application materials. (E.C.F. No. 232 ¶ 66.) Participating employers then review these application materials and provide rank-order lists of preferred applicants to the VIRMP database. *Id*. Using both applicant and employer rank-order lists (each a "Rank-Order List" and collectively, "Rank-Order Lists"), the VIRMP uses a computer algorithm to match applicants with a residency or internship position, and each applicant is offered only one position. (E.C.F. No. 232 ¶ 67.) To participate in the VIRMP, prospective employers must agree to the VIRMP's "Institution Terms of Service," while applicants must agree to the "Applicant Terms of Service." (E.C.F. No. 232 ¶¶ 68, 74.) Among other terms, both the Applicant Terms of Service and Institution Terms of Service prohibit applicants and employers from negotiating inside or outside the VIRMP until match results are announced, and each applicant is required to accept the offer he or she receives on Match Day. (E.C.F. No. 232 ¶ 74.)

Plaintiffs' First Amended Consolidated Complaint (the "Amended Complaint") alleges that the AAVC and Solution Innovations operate the VIRMP to further a monopsony[2] that inhibits competition and restricts compensation for veterinary residents and interns. (E.C.F. No. 232 ¶¶ 104–116.) In support of their allegations, Plaintiffs fundamentally rely on information publicly

---

[2] A "monopsony" is "[a] market situation in which one buyer controls the market. . . . Monopsony injures efficient allocation by reducing the quantity of the input product or service below the efficient level." BLACK'S LAW DICTIONARY 1160 (10th ed. 2014) (internal citations omitted).

available on the VIRMP's website, www.virmp.org, and reports by the American Veterinary Medical Association (AVMA) and American Association of Veterinary Medical Colleges (AAVMC) to support their antitrust claims. (*See* E.C.F. No. 232 ¶¶ 22, 65–78, 82, 90.) Plaintiffs' allegations hinge upon defendants' administration of, development of, and participation in the VIRMP, and Plaintiffs plead no facts to evidence any anti-competitive agreements among the defendants that are not inextricably tied to the VIRMP.

## III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, Plaintiffs are required to show more than "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Rather, the allegations "must be enough to raise a right to relief above the speculative level." *Id*. Even though the Court should accept all well-pleaded allegations in the complaint as true, such factual allegations must "cross the line between possibility and plausibility of entitlement to relief." *Balogh v. Virginia*, 120 F.4th 127, 138 (4th Cir. 2024) (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)). Though the "Rule 12(b)(6) standard is deferential to plaintiffs . . . it still requires facts from which [the Court] can plausibly infer" that Plaintiffs are entitled to the relief requested. *Id*.

## IV. ARGUMENT

### A. THE VIRMP IS AN EXEMPT GRADUATE MEDICAL EDUCATION RESIDENCY MATCHING PROGRAM WITHIN THE SCOPE OF SECTION 207 OF THE PENSION FUNDING EQUITY ACT, 15 U.S.C. § 37B.

#### 1. The VIRMP Is Exempt From Antitrust Scrutiny Under A Plain Reading Of the Text of Section 37b.

"It shall not be unlawful under the antitrust laws to sponsor, conduct, or participate in a graduate medical education residency matching program, or to agree to sponsor, conduct, or participate in such a program." 15 U.S.C. § 37b(b)(2). Plaintiffs fail to state a plausible violation of the antitrust laws because residency match programs are exempt from antitrust liability under Section 37b of Title 15 of the United States Code ("Section 37b"), which provides immunity from antitrust claims to graduate medical education residency matching programs. 15 U.S.C. § 37b. Further, defendants' participation in, conducting, or sponsoring of a residency matching program cannot be used as evidence to support "any claim or action alleging a violation of the antitrust laws." 15 U.S.C. § 37b(b)(2). Not only are residency matching programs exempt from antitrust liability, but Congress has noted that "[a]ntitrust lawsuits challenging the matching process, regardless of their merit or lack thereof, have the potential to undermine this highly efficient, pro-competitive, and long-standing process." 15 U.S.C. § 37b(a)(1)(E). Though veterinary medicine is not mentioned explicitly in Section 37b, a plain reading of the statute demonstrates that the exemption is focused on the mechanics of a match program applicable to clinical medical education, regardless of the kind of patient served. Because Plaintiffs' claims against AAVC and Solution Innovations rely on their operation and administration of a residency matching program covered by a statutory exemption to antitrust laws, Plaintiffs have failed to allege a viable claim for relief.

*a. Purpose and scope of Section 37b.*

In April 2004, Congress enacted Section 37b on the heels of a prominent antitrust case challenging the National Resident Match Program ("NRMP") for reasons nearly identical to those for which Plaintiffs have challenged the VIRMP. *See* 15 U.S.C. § 37b; *Jung v. Ass'n of Am. Med. Colleges*, 184 Fed. Appx. 9 (D.C. Cir. 2006). The statute explains that residency matching

programs exist to prevent students from facing pressure to seek admission to and accept positions with graduate medical education programs (commonly known as "residency programs") at an unreasonably early stage in their education. 15 U.S.C. § 37b(a)(1)(B). Section 37b confirms that "antitrust laws do not prohibit sponsoring, conducting, or participating in a graduate medical education residency matching program" and ensures "that those who sponsor, conduct or participate in such matching programs are not subjected to the burden and expense of defending against litigation that challenges such matching programs under the antitrust laws." 15 U.S.C. § 37b(a)(2). Congress has further explained that matching programs have long served the interests of both applicants and residency programs. *See* 15 U.S.C. § 37b(a)(1)(A).

AAVC and Solution Innovations do not seek to expand the application of Section 37b beyond its own terms but instead ask this Court to recognize that the VIRMP, as pleaded, is a match program that falls under the plain text and structure of the statute. The best reading of Section 37b demonstrates that the VIRMP is a graduate medical education residency matching program because its function is identical to the NRMP and meets the definition set forth in the statute. "To determine a statute's plain meaning, [the court] not only look[s] to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (internal quotation marks omitted). In matters of statutory interpretation, courts "must try to discover the plain meaning of [the] statute using both the text and structure since 'statutory construction . . . is a holistic endeavor." *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 471 (4th Cir. 2011) (quoting *United Sav. Assocs. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Section 37b defines a graduate medical education program as "(i) a residency program for the medical education and training of individuals following graduation from medical school; (ii) a program, known as a specialty or subspecialty fellowship program, that provides more advanced training; and (iii) an institution or organization that operates, sponsors or participates in such a program." 15 U.S.C. § 37b(b)(1)(B). While Section 37b does not explicitly define the term "medical school," the express language of the statute focuses on the pro-competitive benefits of match mechanics, not the type of patients served by those participating in the match, indicating that Congress was not focused on a particular kind of clinical medical education but the match processes used across various medical fields.

The Congressional record related to Section 37b reveals that the exemption was created with awareness of then-ongoing litigation in the U.S. District Court for the District of Columbia where former residents alleged a "price-fixing scheme among graduate medical education programs in the United States." 150 Cong. Rec. S3991 (daily ed. Apr. 8, 2004); *see also Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26 (D.D.C. 2004) (dismissing in full plaintiffs' antitrust claims arising from the NRMP under Section 37b). At the time Section 37b was enacted, the NRMP was the dominant pathway and effective prerequisite to landing an accredited residency in human medicine but not the only match program in existence for clinical medical education. *Jung*, 339 F. Supp. 2d at 32 (explaining that graduate students pursuing a medical degree are "required to enter into the [NRMP] if he or she wishes to gain employment in a residency program . . . a prerequisite for specialty certification"). In fact, the VIRMP, as Plaintiffs admit, "has existed since 1978, and the match process has occurred each year thereafter." (E.C.F. No. 232 ¶ 123.) In interpreting a statute, courts strive "'to give effect to every word that Congress has used' to avoid surplusage." *Healthkeepers, Inc.*, 642 F.3d at 472. Despite the NRMP's dominance over

residencies in human medicine, Congress crafted a non-exclusive definition of a graduate medical education residency matching program by including within its scope programs "*such as* those conducted by the National Resident Matching Program." 15 U.S.C. § 37b(b)(1)(C) (emphasis added). Even a narrow construction of Section 37b cannot override Congress's express intent that the statute applies not only to the NRMP but to all programs that employ rank-order matching systems to match students graduating from a school of clinical medical education with graduate medical education programs.

Nothing in Section 37b or its sparse Congressional record expressly limits the exemption only to recipients of a Medical Doctor degree, a Doctor of Osteopathic Medicine degree, or to human medicine. 150 Cong. Rec. S3991 (daily ed. Apr. 8, 2004) (addressing the legislative process for Section 37b and the exemption's relevance to the *Jung* litigation without any specified intent to limit the exemption solely to the NRMP or human medicine). Instead, Section 37b's language refers to residency matching programs that are functionally similar to the NRMP, using "a computerized mathematical algorithm . . . to analyze the preferences of students and residency programs and match students with their highest preferences from among the available positions in residency programs that listed them." 15 U.S.C. § 37b(a)(1)(D). Nowhere does the language of the statute plainly limit itself by patient type or specific fields of medicine. The statute broadly references "medical school" and "physicians" but never limits those terms only to human medicine. 15 U.S.C. § 37b. Again explicitly going beyond the NRMP, the statute specifically states that "matching programs have been an integral part of an educational system that has produced the finest physicians and medical researchers in the world." 15 U.S.C. § 37b(a)(1)(A). In examining a similarly broad use of general medical practice terms under FLSA, the 9th Circuit in *Clark v. United Emergency Animal Clinic, Inc.* explained that:

> A '*physician' is 'a person skilled in the art of healing; one duly authorized to treat diseases: a doctor of medicine . . . veterinarians are doctors of medicine*, they have advanced degrees, and they are licensed. Nothing in the language of the statute or regulations indicates a distinction between those who practice medicine on humans and those who practice on animals.

390 F.3d 1124, 1127–28 (9th Cir. 2004) (emphasis added).

In *Clark*, a veterinary practice claimed that doctors of veterinary medicine were exempt from overtime pay requirements under the Fair Labor Standards Act (FLSA), 390 F.3d at 1125. The FLSA exempted from overtime pay requirements "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). When examining what qualifies as a bona fide professional capacity, applicable regulations stated that the exception "applies only to the traditional professions of law, medicine, and teaching and not to employees in related professions which merely serve these professions." 29 C.F.R. § 541.314(a) (2004). Regarding medicine[3], the regulations stated that "the exception applies to physicians and other practitioners licensed and practicing in the field of medical science . . . the term physicians means medical doctors including general practitioners and specialists," while excluding ancillary professions like pharmacists, nurses, therapists, and psychologists. 29 C.F.R. § 541.314(b)(1), (c) (2004). Operating under similar requirements to narrowly construe that statute, the 9th Circuit held that "veterinarians plainly fall within the exception" and that nowhere else in the statute was "'medicine' defined to mean only the practice of medicine on humans. The science and art of healing and maintaining health – *i.e.*, medicine – can be and is practiced on animals as well as humans. Logically as well as linguistically, veterinary medicine is a 'branch' of medicine." *Clark*, 390 F.3d at 1127. The court further explained that the language of the statute was broad and further

[3] Black's Law Dictionary defines medicine as "[t]he scientific study and practice of preserving health and treating disease or injury; the science and art of preventing, curing, and alleviating sickness or affliction." BLACK'S LAW DICTIONARY 1131 (10th ed. 2014).

acknowledged that "a doctor of veterinary medicine is a practitioner licensed and practicing in the field of medical science and healing on animals, a branch of medicine." *Id.* at 1128. Although *Clark* does not consider the antitrust laws, the 9th Circuit was similarly required to construe the FLSA statute narrowly and its logic is applicable here. *See id.* at 1126 (explaining that "exemptions to overtime requirements are to be narrowly construed").

While Section 37b does expressly reference the NRMP, which is limited to human medicine and was at the center of the litigation that gave rise to the exemption, it does so as a non-exclusive example of the kinds of match programs excluded from antitrust scrutiny. The statute defines "graduate medical education residency matching program" as a program "*such as* those conducted by the National Resident Matching Program." 15 U.S.C. § 37b(b)(1)(C) (emphasis added). The statute then explains that the true scope of the term is focused on the match process for applicants seeking admission to a graduate medical education program, regardless of the field of medicine. 15 U.S.C. § 37b(b)(1)(B)-(C). Congress had every opportunity to limit the exemption to the NRMP or human medicine but expressly chose to incorporate non-exclusive language into its definition of a graduate medical education residency matching program. It did so because the exemption is directed toward match mechanics designed to reduce pressures faced by applicants to residency programs in clinical medical education, not to address a specific field of medical practice. When construing Section 37b's scope and definitions together, a harmonious reading demonstrates that the exemption applies to graduate medical education residency matching programs that are a functional equivalent – not an industry equivalent – of the National Resident Matching Program. In other words, Section 37b applies to rank-order matching algorithms designed to match applicants graduating from schools of clinical medical education with employers offering graduate medical education programs. 15 U.S.C. §§ 37b(b)(1)(B)–(C).

*b. Defendants AAVC and Solution Innovations are exempt from Plaintiffs' antitrust claims under Section 37b.*

Here, the VIRMP is a functional equivalent of the NRMP and is thus exempt from the antitrust laws under Section 37b. In the Amended Complaint, Plaintiffs allege that, "[u]sing rank-order lists, the [VIRMP] matches applicants to internship and residency positions using a computer algorithm developed by Defendant Solution Innovations under a contract with Defendant AAVC." (E.C.F. No. 232 ¶ 67.) The VIRMP requires applicants and clinical/institutional programs to agree to the program's respective rules and then rank the internship or residency programs where they wish to work in order from most desirable to least desirable. (E.C.F. No. 232 ¶ 66.) The VIRMP then uses a matching algorithm to compare applicants' and residency programs' Rank-Order Lists and match applicants with programs based on the preferences in those Rank-Order Lists. (E.C.F. No. 232 ¶ 67.)

All individuals applying for internships and residencies through the VIRMP are contractually required to accept employment with the program to which they are matched, and all employers are required to offer employment to the applicants with whom they match. (E.C.F. No. 232 ¶¶ 69, 74.) After match results are announced, a list of unmatched applicants is sent to participating employers for consideration. (E.C.F. No. 232 ¶¶ 67, 124.) While both the Rank-Order Lists of both applicants and participating institutions are kept confidential, all open residency positions, including descriptions of the nature of the position, location, benefits, and salary information, are available to both applicants and the public at large on www.virmp.org at all times.[4]

[4] Plaintiffs repeatedly make general citations to the VIRMP website and documents contained thereon. (E.C.F. No. 232 ¶ 78.) Even if a document or webpage is not expressly attached to a complaint, the court may consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd*., 484 F.3d 700, 705 (4th Cir. 2007); *Phillips v. LCI Int'l, Inc*., 190 F.3d 609, 618 (4th Cir. 1999); *see also Parrino v. FHP, Inc*., 146 F.3d 699, 705–06 (9th Cir. 1998). The VIRMP website and its respective terms of service are expressly cited and relied upon by Plaintiffs in bringing claims focused entirely on wage suppression and bargaining restraints. (E.C.F. No. 232 ¶ 78.) Thus, this Court may consider other

The VIRMP serves the same purpose as the NRMP: to establish an efficient matching process for prospective residents that demands commitment from participating employers to make offers to matched applicants consistent with the job descriptions initially relied upon by applicants in creating their Rank-Order Lists. 15 U.S.C. § 37b(a)(1)(D) ("The [National Resident Matching Program] uses a computerized mathematical algorithm, as students had recommended, to analyze the preferences of students and residency programs and match students with their highest preferences from among the available positions in residency programs that listed them."). In *Jung*, the district court further described aspects of the NRMP that are materially indistinguishable from those employed in the VIRMP. *See Jung*, 339 F. Supp. 2d at 31–32. Beyond using a computerized algorithm to facilitate the match process, the NRMP also requires its applicants and participating employers to enter into contracts with the NRMP's sponsoring organization that include "*policing mechanisms*" to "*compel compliance*" with rules that require applicants to "commit contractually to any assigned position as a condition of enrolling in the [NRMP]." *Id* at 32 (emphasis added). The VIRMP utilizes restrictions of the same kind through the Applicant Terms of Service and Institution Terms of Service. In fact, Plaintiffs expressly assert that AAVC and Solution Innovations "implement *policing mechanisms* to *compel compliance* with [the] restraints" set forth in the Applicant Terms of Service and Institution Terms of Service. (E.C.F. No. 232 ¶ 72.) In short, the VIRMP is a program "such as those conducted by the National Resident Matching Program." 15 U.S.C. § 37b(b)(1)(C); *see also Jung*, 339 F. Supp. 2d at 31–32.

The VIRMP is thus a functional equivalent of the National Resident Matching Program and fulfills the definition of a "graduate medical education residency matching program" exempt from antitrust laws under the best reading of Section 37b. 15 U.S.C. §§ 37b(a)(1)(D), (b)(1)(C),

publicly published information available on the VIRMP's website, such as its public list of open residency and intern positions and their respective salaries.

(b)(2). Accordingly, Plaintiffs' claims against AAVC and Solution Innovations must fail because the defendants' participation in the VIRMP is statutorily exempt from liability under the antitrust laws.

*c. Plaintiffs fail to plead any anticompetitive conspiracy involving AAVC or Solution Innovations that does not materially rely on the VIRMP.*

Further, Plaintiffs fail to support their antitrust claims by providing any factual allegations against AAVC or Solution Innovations beyond their administration of the VIRMP. (E.C.F. No. 232 ¶¶ 22, 65–78, 82, 84, 90.) "Evidence of any [agreement to sponsor, conduct, or participate in a graduate medical education residency matching program] shall not be admissible in Federal court to support any claim or action alleging a violation of the antitrust laws." 15 U.S.C. § 37b(b)(2). When the allegations set forth in a complaint are "inextricably intertwined" with a graduate medical education residency matching program, then such claims are barred by the exemption set forth in Section 37b. *Jung*, 184 Fed. Appx. at 11. To survive a motion to dismiss, Plaintiffs must demonstrate that, absent all allegations tied to an exempt graduate medical education residency matching program, the "Court in fact would have come to the same conclusion that a conspiracy existed." *Id*. Section 37b "forbids [the] invocation of the [VIRMP] as evidence in any antitrust suit, including one involving allegations of price-fixing." *Id*. at 12.[5] All of the conduct Plaintiffs allege in the Amended Complaint to evidence AAVC's and Solution Innovations' purported violations of antitrust law are inextricably intertwined with the administration, sponsorship, and operation of the VIRMP.

The Amended Complaint exclusively cites the website, rules, terms, and procedures of the VIRMP to challenge alleged "horizontal competitive restraints that Defendants have embedded in,

[5] The DC Circuit Court of Appeals has held that Section 37b(b)(3)'s savings clause cannot be invoked through evidence of an "overriding integrated antitrust conspiracy with [a graduate medical education residency matching program] as its centerpiece." *Jung*, 184 Fed. Appx., at 12.

and enforce through, the [VIRMP].” (E.C.F. No. 232 ¶ 4.) Specifically, the First Cause of Action only relies on allegations that the defendants conspired to restrain competition by formulating an agreement to artificially fix wages through the VIRMP generally and AAVC’s various terms of service, and by “prohibiting [VIRMP] participants from negotiating inside or outside [VIRMP] until match results are released and requiring participants to accept the position with which they match.” (E.C.F. No. 232 ¶ 162.) Plaintiffs set forth no specific factual assertions regarding AAVC or Solution Innovations that are independent of the VIRMP. Therefore, all of Plaintiffs’ allegations in their First Cause of Action inseparably rely on the defendants’ mutual participation in the VIRMP and are facially inadmissible in light of the exemption and evidentiary prohibition set forth in Section 37b. 15 U.S.C. § 37b. Because the factual allegations in the Amended Complaint are barred by federal law from evidentiary use in antitrust claims, Plaintiffs have further failed to state a plausible claim upon which relief might be granted.

**2. Congress Has Already Resolved The Competitive Significance of Match Mechanics in Section 37b.**

Even if this Court determines that Section 37b was enacted with an exclusive focus on human medicine, Congress’s finding that residency match programs are pro-competitive settles any inquiry into the competitive significance of the VIRMP, a match program that is materially indistinguishable from the NRMP. Both the VIRMP and NRMP use computer algorithms and rank-order lists from both applicants and employers to match applicants with a position from their lists. 15 U.S.C. § 37b(b)(1)(C); *see also* (E.C.F. No. 232 ¶¶ 65–78 ); *Jung*, 339 F. Supp. 2d at 31–32. In fact, the only relevant difference between the programs demonstrates that the VIRMP is notably more competitive than the NRMP. In human medicine, all medical students are “required to enter into the [NRMP] if he or she wishes to gain employment in a[n] [accredited] residency program.” *Jung*, 339 F. Supp 2d at 32. Conversely, Plaintiffs admit that veterinary institutions are not required

to offer residency and internship programs through the VIRMP. (E.C.F. No. 232 ¶ 73.) Unlike human medicine which requires graduates to complete a residency to achieve status as a board-certified physician[6], veterinary school graduates are not required to participate in a residency or internship at all to begin general practice. (E.C.F. No. 232 ¶¶ 101, 116). Even if a veterinary school graduate desires to complete a residency or internship, Plaintiffs expressly admit that only a "*majority* of veterinary institutions *elect* to hire interns and residents" through the VIRMP. (E.C.F. No. 232 ¶ 73 (emphasis added).) Institutions are not required to use the VIRMP, and some residency and internship programs are offered outside the VIRMP. With numerous paths available for recent graduates of veterinary medical schools to practice veterinary medicine under a Doctor of Veterinary Medicine license without participating in the VIRMP, the veterinary match is decidedly less restrictive than its human medicine counterpart. Regardless, Congress has stated that residency match programs are "highly efficient" and "pro-competitive." 15 U.S.C. § 37b(a)(1)(E). Given the materially indistinguishable nature of the VIRMP and NRMP, Plaintiffs cannot plausibly ask this Court to treat the VIRMP's match mechanics as anticompetitive.

### B. EVEN IF SECTION 37B DOES NOT FULLY BAR THE CLAIMS, PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED THAT AAVC AND SOLUTION INNOVATIONS JOINED ANY CONSPIRACY TO DEPRESS WAGES

In addition to the arguments set forth in all defendants' omnibus brief joined by AAVC and Solution Innovations, the Amended Complaint further does not plausibly allege facts to implicate AAVC or Solution Innovations in any purported conspiracy. Plaintiffs allege that the AAVC and Solution Innovations conspired to "artificially fix, stabilize, or depress compensation" paid to

[6] The Federation of State Medical Boards, a non-profit organization representing the interests of licensing boards for human medicine in all fifty states, has explained that those entering the practice of human medicine must "complete at least one year of postgraduate training in order to be eligible for a full and unrestricted medical license." *About Physician Licensure*, Federation of State Medical Boards (last visited May 23, 2026), https://www.fsmb.org/u.s.-medical-regulatory-trends-and-actions/guide-to-medical-regulation-in-the-united-states/about-physician-licensure/.

Plaintiffs. (E.C.F. No. 232 ¶ 159.) The Amended Complaint only offers Solution Innovations' "web development and database design" as evidence that it helps administer the VIRMP with the AAVC (E.C.F. No. 232 ¶ 20.) Regarding AAVC, Plaintiffs only assert that (1) AAVC is the sponsor of the VIRMP, (2) that the VIRMP uses a rank-order matching system to match applicants with participating programs, (3) that each participating applicant and program must agree to abide by the AAVC's respective terms of service or face sanctions and a bar from the VIRMP, and (4) that the AAVC collects from the program defendants and publishes available residency and internship positions on a publicly available job board that includes compensation and logistical details about each position. (E.C.F. No. 232 ¶¶ 19, 21, 65–82.) Plaintiffs' claims against the AAVC and Solution Innovations are implausible for several reasons.

**First,** where Plaintiffs allege a horizontal conspiracy, they must plead an agreement to restrain trade among competitors. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018). AAVC is a membership organization that administers the VIRMP. (E.C.F. No. 232 ¶ 19.) Plaintiffs are required to demonstrate that AAVC and Solution Innovations are competitors that made a "conscious commitment" with other competitors to restrain trade. *SD3, LLC v. Black & Decker (U.S.), Inc.*, 801 F.3d 412, 424, 430 (4th Cir. 2015). AAVC does not participate in the VIRMP as an employer for potential residents or interns and is thus not a competitor with the other Defendants. As such, there can be no horizontal conspiracy between AAVC and the employer defendants.

**Second,** Plaintiffs' failure to plausibly suggest that the AAVC or Solution Innovations entered into any preceding agreement with any of the program defendants is independently fatal because it eliminates any theory of vertical wage-fixing. *See SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 557). As the Supreme Court has acknowledged, "vertical price restraints are

to be judged by the rule of reason," so Plaintiffs' claim that AAVC's and Solution Innovations' management of the VIRMP is *per se* anticompetitive must fail. *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007). Plaintiffs' theories ask this Court to conjure from mere speculation the existence of an illicit agreement (dating back to 1978) involving the AAVC to suppress wages whereby the VIRMP is a means of effecting such agreement. Yet, as explained above, Plaintiffs plead no direct or circumstantial evidence to plausibly suggest such an agreement exists. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 225–26 (4th Cir. 2004)*; *SD3*, 801 F.3d at 424. Instead, they offer only the AAVC's Applicant Terms of Service, Institution Terms of Service, and publicly published salary data in furtherance of their "bare assertion of conspiracy." *Twombly*, 550 U.S. at 556-57. Plaintiffs do not allege that AAVC, whether independently or through its Applicant or Institution Terms of Service, requires participating programs to limit, fix, or otherwise adhere to any guidelines that depress wages for available positions. This is because AAVC neither requires nor encourages programs to coordinate salary offers, cap wages, or depress compensation for available positions. In fact, the Institution Terms of Service relied upon by Plaintiffs in the Amended Complaint contain no compensation guidelines at all, save that participating programs must submit accurate information to the VIRMP database. *See* VIRMP, *Terms of Service*, https://www.virmp.org/Home/TermsOfService (last visited May 11, 2026); (E.C.F. No. 232 ¶¶ 65–82.)

Instead, Plaintiffs allege only that the VIRMP rules require applicants to accept the position with which they match and prohibit applicants from negotiating inside or outside of the VIRMP until match results are announced. (E.C.F. No. 232 ¶¶ 5, 69–71, 74, 78 163.) Rather than some ephemeral conspiracy to restrain trade, the obvious alternative explanation for these requirements is that the AAVC implements these rules to ease the pressure felt by students to, "at an

unreasonably early stage of their medical education, to seek admission to, and accept offers from, residency programs." 15 U.S.C. § 37b(a)(1)(B). Both the Applicant Terms of Service and Institution Terms of Service prohibit programs from requiring applicants to disclose "how [the applicant] plan[s] to rank that institution or private practice" and note that any statements regarding such are non-binding. See VIRMP, *Terms of Service*, https://www.virmp.org/Home/TermsOfService (last visited July 24, 2026). Programs are specifically prohibited from requiring any "commitments or contracts with applicants prior to the notification of the selections made through the VIRMP." *Id*. Applicants are even able to withdraw from the VIRMP if they do so prior to a set deadline. *Id*. While programs and applicants are free to communicate during the match process, the AAVC expressly implements safeguards to ensure that applicants have access to fair, efficient, and non-oppressive hiring practices.

Further, the VIRMP publicly publishes salary statistics on its website that tell a vastly different story than the anemic price fixing allegations levied by Plaintiffs. *See* VIRMP, *Match Data*, https://www.virmp.org/Home/Statistics (last visited July 24, 2026). The 2026 Match salary data published on the VIRMP website shows that for-profit internship salaries ranged from $35,000 to $140,000. *Id*. For-profit residency salaries ranged from $35,000 to $100,000. *Id*. For internships at academic institutions, salaries ranged from $30,000 to $57,500 and salaries for residencies within academic institutions ranged from $35,000 to $67,000. Plaintiffs' entire case relies on the alleged use of the VIRMP to artificially "fix wages" (E.C.F. No. 232 ¶ 117), while simultaneously understating the chasmic range of salaries offered by participating programs. If the VIRMP were designed to disadvantage residents and interns by using bargaining restrictions to further a wage fixing scheme as Plaintiffs implausibly claim, it has failed spectacularly in that purpose.

The Amended Complaint's references to compensation data and purported "guidance” do not cure this defect. At most, Plaintiffs allege that salary information was collected, analyzed, and made publicly available, and that generalized guidance regarding intern and resident wellbeing was published. (E.C.F. No. 232 ¶¶ 81–86.) Plaintiffs do not allege facts showing that AAVC or Solution Innovations required any participating employer to adopt a particular salary, adhere to a salary cap, reduce compensation, refrain from increasing compensation, or coordinate compensation decisions with any other employer. Nor do Plaintiffs allege that Solution Innovations had any role in setting, recommending, enforcing, or monitoring compensation. Instead, Plaintiffs' allegations establish only that AAVC and Solution Innovations assisted in administering the VIRMP and in collecting or publishing information regarding available positions and compensation. (E.C.F. No. 232 ¶¶ 19–20, 64–69, 81–86.) In short, none of the VIRMP terms or participation requirements established and administered by AAVC and Solution Innovations—and alleged by Plaintiffs to be “reciprocal commitments” that form the "rim" of the purported hub-and-spoke conspiracy—contain any provision governing participating programs' wage offerings, compensation levels, salary ranges, or other compensation decisions. (E.C.F. No. 232 ¶ 160.)

At most, the Amended Complaint challenges the AAVC’s non-price administrative rules governing participation in the VIRMP, claims that are not *per se* unlawful, not plausibly anticompetitive as pleaded, and not remotely sufficient to suggest that the AAVC or Solution Innovations engaged in any conspiracy with the program defendants to suppress wages or unlawfully restrain trade. No matter how often the Amended Complaint broadly characterizes the VIRMP as a vehicle for conspiracy, Plaintiffs do not plead facts plausibly showing that AAVC or Solution Innovations controlled, encouraged, or facilitated participating institutions’ wage offerings. Plaintiffs allege separate vertical agreements between individual program defendants

and AAVC based solely on Institution Terms of Service that include no substantive salary requirements. These claims are, at best, a single, rimless-wheel theory that cannot ensnare AAVC in Section 1 liability absent independent anticompetitive conduct that is not asserted in the Amended Complaint. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002) (holding that an attempt to plead "a single, rimless wheel conspiracy . . . must be rejected"); *see e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193, 1198 (9th Cir. 2015); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010); *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). Because the VIRMP's structure imposes no wage requirements on programs, contains no mechanism, by design or in practice, for inter-program coordination, and because Plaintiffs fail to plead any involvement by the AAVC or Solution Innovations in the purported conspiracy aside from their administration and development of the VIRMP, Plaintiffs fail to plausibly allege a viable wage-fixing or monopsony claim against the AAVC or Solution Innovations.

## V. CONCLUSION

Like the other residency matching programs, the VIRMP is a pro-competitive solution designed to administer a fair and efficient method for matching applicants with their preferred veterinary residency and internship programs. Because the VIRMP satisfies the definition of a graduate medical education residency program under a harmonious reading of Section 37b, the VIRMP is exempt from antitrust scrutiny. 15 U.S.C. § 37b. Even if all facts in the Amended Complaint are taken as true, all allegations relying on the VIRMP or an integrated antitrust scheme arising from the defendants' administration of and participation in the VIRMP are statutorily inadmissible. *See* 15 U.S.C. § 37b(b)(2); *Jung*, 184 Fed. Appx., at 12. Without invoking the VIRMP, the Complaint rests on nothing more than broad legal conclusions and mere recitations of

the elements for an antitrust claim and a vague, rimless wheel theory based on contracts that contain no provisions indicating that AAVC or Solution Innovations govern wage offerings within the VIRMP. Therefore, because the VIRMP is a graduate medical education residency matching program exempt from liability under the antitrust laws and because Plaintiffs have failed to otherwise state a plausible claim upon which relief can be granted, AAVC and Solution Innovations respectfully request that the Court dismiss Plaintiffs' complaint with prejudice and grant such other relief as may be just and proper.

Respectfully submitted this thirty-first day of July, 2026.

AMERICAN ASSOCIATION OF VETERINARY CLINICIANS
SOLUTION INNOVATIONS, INC.

/s/ Jake L. Bryant
By Counsel

GENTRY LOCKE RAKES & MOORE LLP
10 Franklin Rd SE Ste 900
Roanoke, VA 24011
J. Scott Sexton (VSB No. 29284)
sexton@gentrylocke.com
Jake L. Bryant (VSB No. 99696)
jbryant@gentrylocke.com

DARKHORSE LAW PLLC
119-B Tradewynd Dr.
Suite B
Lynchburg, VA 24502
Andrew P. Connors (VSB No. 80248)
andrew@darkhorse.law
Christopher T. Akins-Chong (VSB No. 101698)
ctakins@darkhorse.law

*Counsel for Defendants American Association of Veterinary Clinicians and Solution Innovations, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this thirty-first day of July, 2026, I electronically filed the foregoing with the Clerk using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Jake L. Bryant

GENTRY LOCKE RAKES & MOORE LLP
10 Franklin Rd SE Ste 900
Roanoke, VA 24011
J. Scott Sexton (VSB No. 29284)
sexton@gentrylocke.com
Jake L. Bryant (VSB No. 99696)
jbryant@gentrylocke.com

DARKHORSE LAW PLLC
119-B Tradewynd Dr.
Suite B
Lynchburg, VA 24502
Andrew P. Connors (VSB No. 80248)
andrew@darkhorse.law
Christopher T. Akins-Chong (VSB No. 101698)
ctakins@darkhorse.law

*Counsel for Defendants American Association of Veterinary Clinicians and Solution Innovations, Inc.*